IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEBRA CHECA | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO.  16-108 |
| DREXEL UNIVERSITY, et al. | : | |

## MEMORANDUM

KEARNEY, J.                                                      June 28, 2016

Congress passed the Family and Medical Leave Act to, among other things, protect employees from employers interfering with authorized leave or retaliating against them for taking the authorized leave.  If, after the full authorized leave, the employee returns to her same job with no change, she bears a difficult factual burden to show her employer retaliated against her for taking leave.  Today we address whether an employer retaliates by either: a discourteous welcome back to work including holding a meeting to address tasks not completed by an employee before leave resulting in the employee's impetuous resignation; or, declining to accept the employee's next day effort to rescind her impetuous resignation.  Based on facts adduced during discovery, we grant the employer's motion for summary judgment in the accompanying Order as we do not find co-worker discourtesies, a "first day back" meeting called to remedy pre-leave job performance deficiencies or deciding not to accept the employee's next-day decision to rescind her resignation constitutes the level of retaliation providing a remedy under the Family and Medical Leave Act.

## I.       Undisputed Facts[1]

Plaintiff Debra Checa began working at Defendant Drexel University College of Medicine ("Drexel") in 2010. Since April 2013, she worked for Drexel's Division of Rheumatology as a Program Manager and Fellowship Coordinator.[2] Dr. James Reynolds leads Drexel's Department of Medicine.   Checa's supervisor, Dr. Carolyn O'Connor, leads the Rheumatology Division.[3] Defendant Kathy Lally provided administrative support to the Rheumatology Division and served as a resource to Checa, though she did not have disciplinary authority over her.[4]   Checa's pre-leave duties included managing scheduling issues for clinical patients, attending physicians, and rheumatology fellows, and performing general office duties such as answering phones, ordering supplies, and managing expense reimbursements and travel arrangements.[5]

Checa sought FMLA leave to receive carpel tunnel surgery.  Drexel approved all of Checa's requested leave under the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, ("FMLA") including from June 25, 2014 through September 14, 2014.[6]   Checa notified Dr. O'Connor of the requested 2015 leave approximately one (1) month before it began, and Dr. O'Connor subsequently told Lally.[7]  Lally arranged for Christina Zervoudakes to cover Checa's fellowship duties during her leave.  Zervoudakes and Checa compiled a list of tasks for Checa to complete before she took leave.[8]

While on leave and recovering from her surgery, Checa's mother passed away.[9]  Due to her mother's passing, and extended physical therapy, Drexel approved Checa's request to extend her leave until September 15, 2014.[10]   Checa returned to Drexel on September 16, 2015, and met with both Lally and Zervoudakes to discuss transitioning work back to her and review tasks which Checa failed to complete before taking leave.[11]   Checa claims neither Lally nor

Zervoudakes gave Checa a warm welcome, or offered condolences on her mother's passing.[12] During this "first day back" meeting, Zervoudakes presented Checa with the list of incomplete tasks which Checa agreed to complete before taking leave. Checa became upset during this meeting, and stood up and said, "I quit."[13] Checa returned to her office and called Dr. O'Connor, informed her of the meeting, and said "I quit," again.[14] Later the same day, Checa emailed Dr. O'Connor and Lally again affirming her resignation,

> I am sorry but I did not expect to be attacked by a very unhappy, miserable, "perfect" person (Christina) who agreed to cover while I was out, and be told about everything I didn't do, and how everything I did do was incorrectly done....This is not the place for me. I hope you find someone more competent, maybe (sic) … My last day will be Friday, October 10, 2014.[15]

The next morning, Checa met with Dr. O'Connor and attempted to retract her resignation.[16] Dr. O'Connor informed Dr. Reynolds of Checa's desire to rescind her resignation, and Dr. Reynolds did not accept this request.[17]

## II.    Analysis

Checa argues Lally orchestrated the "first day back" meeting as a "planned attack" and Drexel's retaliatory intent motivated its refusal to accept her next day attempt to rescind her resignation.[18]    Checa relies on statements from Drexel employees Beverly Johnson who allegedly said Drexel employees set her up and Joyce Segal who told her "she has seen Lally do this before."[19]

Drexel moves for summary judgment because Checa fails to establish a *prima facie* case for FMLA retaliation.[20] FMLA retaliation claims require proof of employer's retaliatory intent, and claims based on circumstantial evidence are assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*.[21] Under this framework, Checa must first establish a *prima facie* case by citing evidence sufficient to create a genuine factual dispute about

each of the three (3) elements of her retaliation claim.[22] To prevail on a FMLA retaliation claim, "the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights."[23] If Checa establishes a *prima facie* case, the burden shifts to Drexel to "articulate some legitimate, nondiscriminatory reason for the adverse action."[24] To satisfy this burden, Drexel must introduce evidence which, taken as true, "would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."[25] If Drexel meets its burden, then Checa must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either 1) disbelieve the employer's articulated legitimate reasons, or 2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."[26]

### A. Checa has not established a *prima facie* retaliation case.

No party disputes Checa availed herself of a protected right to FMLA leave. Drexel argues Checa fails to establish the second or third elements of her *prima facie* case because she did not suffer a materially adverse employment action and she cannot show a sufficient causal link between the protected FMLA leave and the decision to not allow her to rescind her resignation. Checa argues both the "first day back" meeting and Drexel's refusal to allow her to rescind her resignation the next day qualify as adverse employment actions. Checa also argues she suffered a constructive discharge. Checa argues sufficient evidence of causation exists based on the temporal proximity between the alleged adverse actions and invoking her FMLA rights.

We find Checa cannot establish a *prima facie* retaliation case because she cannot show the "first day back" meeting constituted constructive discharge or the decision not to accept her next day resignation qualifies as an adverse employment action. Even assuming she could show

4

Drexel's decision not to accept Checa's resignation constitutes an adverse employment action, we still must grant summary judgment to the Defendants as Checa also cannot establish causation between the alleged adverse employment acts and her FMLA leave.

### 1.    Checa cannot show an adverse employment action.

An adverse employment action is "an action that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee."[27]  In *Budhun*, our Court of Appeals held a reasonable jury could find replacing an employee after her failure to return for work following FMLA-leave constitutes an adverse employment action because she could not return to her previous job or be transferred to another position, which "certainly altered her privileges of employment."[28]  Our Court of Appeals does not require formal termination as a necessary element of an adverse employment action as much less serious actions have sufficed.[29]

In Title VII retaliation claims, the United States Supreme Court expanded the definition of "adverse employment actions."[30]    In retaliation claims, a plaintiff need only establish an action is materially adverse, "which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[31]  The Supreme Court imposed the "material" requirement "to separate significant from trivial harms."[32]  The standard is more general than Title VII's substantive provision because "the real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships."[33]  The Supreme Court noted a change in an employee's work schedule may be trivial to one employee, but crucial to a young mother with school-age children because it impedes her ability to work and take care of her family; a supervisor's refusal to invite an employee to lunch is trivial, but a refusal to invite an employee to a training lunch can be

materially adverse because it impedes career advancement.[34]  Our Court of Appeals has not yet decided whether this expanded definition applies to FMLA retaliation claims.[35]  Yet, because Title VII "provides helpful guidance" in FMLA retaliation cases, courts in this Circuit have applied the *Burlington* standard.[36]  We need not predict whether our court of appeals would apply the broader standard espoused in *Burlington*, because under either standard, Checa cannot establish an adverse employment action.

### a.  Drexel's "first day back" meeting is not an adverse employment action.

Drexel argues the "first day back" meeting between Checa, Lally, and Zervoudakes does not rise to the level of an adverse employment action. Checa claims Lally and Zervoudakes did not exchange pleasantries at the start of the meeting, nor did they offer their condolences for the loss of Checa's mother during her leave. Drexel counters Lally conducted the meeting to transition Checa's job duties back to her and the failure to exchange niceties combined with work-related discussions is not a materially adverse employment action.  Lally acknowledged the meeting concerned work-related issues discovered during Checa's absence.[37]  Dr. Reynolds stated he knew about the meeting two (2) weeks prior to Checa's return from leave, and he considered the meeting to be a disciplinary form of employee counseling.

Although unsatisfactory job evaluations or disciplinary actions can constitute adverse employment actions, Checa still fails to show why this particular meeting constitutes a materially adverse employment action. The meeting did not alter her terms or conditions of employment as in *Budhun*, nor did attending this meeting significantly impact her ability to work or advance in her career. Checa did not suffer a change in job title with less prestige, a suspension of pay, or a change in work schedule.  We further find a reasonable jury could not find the meeting would dissuade a reasonable person from invoking their right to FMLA leave in the future.  The

meeting discussed pre-leave issues Checa failed to complete. Also, as discussed above, there is no indication Drexel reassigned Checa's fellowship duties to Zervoudakes. Although we should take into account the expectations and relationships when considering if an adverse action is material, Lally's and Zervoudakes' failure to exchange pleasantries with Checa is not an adverse employment action.

Checa argues Lally's supervisory authority, combined with Dr. Reynolds' knowledge of the meeting, qualifies the meeting as a disciplinary action or unsatisfactory job evaluation. Dr. Reynolds' awareness of the meeting does not alter the nature of the meeting. Also, Lally did not have disciplinary authority over Checa.[38]   Checa did not receive a formal written or oral performance evaluation at this meeting, but merely received criticisms about failing to complete some of her assigned tasks before she left.  This does not rise to the level of a negative performance evaluation or disciplinary action.

The "first day back" meeting, and the issues discussed at the meeting, do not qualify as a materially adverse employment action.  Under Checa's reasoning, an employer should forget about pre-leave performance deficiencies or deliver them in a more courteous manner.  But our workplace discrimination laws are not designed to remedy everyday slights or "trivial harms."[39] We see no basis for extending Congress' remedial mandate to this type of employer conduct.

### b.   Checa has not shown constructive discharge equating to an adverse employment action.[40]

Checa has not shown the "first day back" meeting is a constructive discharge.  We may find constructive discharge where "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."[41]  Whether a constructive discharge occurred is measured by an objective standard, and the harassment must be so severe and pervasive to cause a reasonable worker to resign. The

7

requisite level of harassment must be even greater than is required for a hostile work environment.[42] Factors indicative of a constructive discharge include a threat of discharge or suggestions of resignation, demotions or reductions in pay or benefits, involuntary transfer to a less desirable position, alteration of job responsibilities, or unsatisfactory job evaluations.[43]

Checa argues Drexel had a premeditated plan to discipline her the day she returned from leave. Checa cites Dr. Reynolds' knowledge of the meeting two (2) weeks before her return and his belief the meeting was a disciplinary form of employee counseling. Because this meeting occurred the day she returned from leave, Checa argues any reasonable employee would feel set up for taking FMLA leave.

Checa cannot establish a constructive discharge claim because although the first day back meeting upset her, a reasonable employee in her position would not have found one (1) meeting so intolerable she had to resign. In fact, the next day she changed her mind and wanted to stay employed. She offered no evidence to show an environment with extensive, severe, and pervasive levels of harassment to cause a reasonable worker to resign. A brief meeting involving criticisms of her pre-leave work, without pleasantries or condolences, does not rise to the level of harassment warranting a constructive discharge. Although Checa may have been upset by this meeting, no witness described a pervasive environment of harassment so great a reasonable worker would have resigned. At the meeting, the parties discussed tasks left incomplete by Checa before her FMLA leave. This meeting, despite its critical nature, and despite Lally's and Zervoudakes' alleged unfriendly tone, does not rise to the level of harassment to support a constructive discharge claim.

8

      c.       **Refusing to accept Checa's rescinded resignation is not an adverse employment action.**

Drexel argues its decision to not allow Checa to rescind her voluntary written resignation is not an adverse employment action. Our Court of Appeals has not recognized voluntary resignations to be adverse employment actions.[44]   Courts in this circuit specifically decline to recognize the refusal to allow an employee to rescind his resignation to be an adverse employment action, without a contractual or statutory duty to do so, or without a finding of a constructive discharge.[45]   Checa argues her claim is different. She now alleges constructive discharge.  As shown, we see no constructive discharge.

Drexel's decision may be construed as an adverse employment action under other facts evidencing a constructive discharge by the employer.  But not here.  Under the undisputed facts, the "first day back" meeting did not constitute a constructive discharge. An adverse employment action is "an action that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee."[46]   Drexel's decision to not allow Checa to rescind her resignation, as she had already resigned, did not alter her privileges of employment, deprive her of employment opportunities, or adversely affect her status as an employee. She resigned, scheduled to leave on October 10, 2014. Drexel's decision not to accept her next day rescission did not alter her employment status.  Drexel's decision is not actionable under the FMLA.

      2.       **Checa lacks evidence of causation between Drexel's action and invoking her FMLA rights.**

Drexel argues Checa's repeated voluntary resignations broke any causal link between the conclusion of Checa's FMLA leave and Dr. Reynolds' decision to not allow her to rescind her

resignation. Drexel argues the two (2) verbal resignations, and the written resignation via email, breaks the causal link between the leave and the perceived adverse decision by Reynolds.

To establish a causal link between FMLA leave and an adverse employment action, Checa must show either: (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link.[47] Temporal proximity alone is not sufficient to establish a causal connection, unless it is unusually suggestive.[48]  Instead, a "broad array of evidence" is used to determine whether a sufficient causal link exists to survive a motion for summary judgment.[49] Factors such as intervening antagonism, retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or temporal proximity can support the inference of causation.[50] The entire record as a whole is used to establish causation, because the inquiry into causation requires an inquiry into the motives of an employer, which is context-specific.[51]   Circumstantial evidence can be taken into account to establish the causal connection.[52]

A causal link between an employee's protected activity and an adverse employment action can be broken by an intervening event.[53] In *Weiler*, the court found the plaintiff's abandonment of the job site broke the causal link between the protected activity, reporting of the employer's inappropriate behavior, and the adverse employment action, being plaintiff's termination.[54] In *Calero*, the court found the timing was not unusually suggestive, the manager who terminated the plaintiff was unaware of the FMLA leave request, and, most notably, the plaintiff's alleged falsifying of time records severed any causal connection between the leave request and any termination.[55]

Checa argues the temporal proximity is unduly suggestive and indicative of Drexel's retaliatory intent. Checa specifically notes Zervoudakes received increased compensation for the extra work she performed during Checa's leave, and no fellow within the fellowship program suffered as a result from Checa's uncompleted tasks. Checa argues no legitimate reason existed to discipline her on the day she returned from leave. Checa also argues causation exists under a "cat's paw" theory. Under a "cat's paw" theory, Checa can establish liability if one or more of her nonsupervisory coworkers: "(1) performed an act motivated by discriminatory animus; (2) the act was intended by the coworker to cause an adverse employment action; (3) that act is a proximate cause of the ultimate employment action, and either (a) defendants acted negligently by allowing the co-worker's acts to achieve their desired effect though they knew (or reasonably should have known) of the discriminatory motivation, or (b) the coworker was aided in accomplishing the adverse employment action by the existence of the agency relation."[56]

Although the timing between Checa's leave and Drexel's decision is less than two (2) days, Checa prompted this close temporal proximity, not Drexel. Drexel refused to allow Checa to rescind her resignation because Checa decided to resign the day she returned from leave. Factors such as intervening antagonism, retaliatory animus, or inconsistencies in the employer's articulated reasons for terminating the employee are not present here. Although Lally and Zervoudakes may not have been as friendly as hoped, or their criticisms may have been harsh, these instances do not qualify as intervening antagonism or retaliatory animus in response to FMLA leave. Also, no inconsistency exists among Drexel employees' testimony regarding the decision to not allow Checa to rescind her resignation.  Dr. Reynolds testified Checa's reaction to the meeting and repeated resignations prompted his decision.[57]   This is consistent with Drexel's proffered reasons, and the testimony of O'Connor, Lally, and Zervoudakes. Even if a

causal link existed between Checa's leave and Dr. Reynolds' decision, Checa's repeated resignations, and the nature of her written resignation, serves as an intervening event to sever any causal link. As in *Weiler*, Checa's decision to resign is a sufficient intervening event to break causation.

> **B.** **Even if Checa showed a *prima facie* retaliation case for retaliation, her claim fails because she cannot defeat Drexel's legitimate, non-discriminatory reasons for the adverse actions.**

Even if we found Checa established a *prima facie* retaliation claim, Drexel is entitled to summary judgment because it offers legitimate, non-discriminatory reasons for the adverse actions, and Checa cannot show competent evidence which would cause a fact finder to disbelieve Drexel's reasons or believe a discriminatory reason actually motivated the decision.

> **1.** **Drexel proffered legitimate, non-discriminatory reasons.**

Drexel offered legitimate, non-discriminatory reasons for the alleged adverse employment actions. Drexel contends it conducted the "first day back" meeting to correct Checa's work-related issues occurring before her FMLA leave and to transition work back to her after her return from leave. Drexel did not allow Checa to rescind because of her inability to accept constructive criticism during the meeting and her unprofessional resignation. All of these reasons, if taken as true, "would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision," satisfying Drexel's burden under the *McDonnell Douglas* framework.[58] Drexel cites Checa's inability to specifically remember any of the alleged unfinished work items discussed at the meeting. Checa does not assert an employee fabricated comments or said them to her for a retaliatory reason.

## 2.     Checa did not show Drexel's stated reasons are pretext.

Checa argues Drexel's reasons are pretext for retaliation and Drexel acted to further a discriminatory purpose not for the legitimate proffered reasons.  Checa argues because Drexel has offered "multiple story-lines," it has not offered a legitimate, non-discriminatory reason for the refusal, and so it must be a pretext for retaliation.[59]  Dr. Reynolds acknowledged the meeting had a disciplinary nature and Lally contradicted herself about whether the meeting had a critical nature. Checa also argues pretext because Zervoudakes complained about the work Checa left incomplete but received increased compensation for the extra work. Checa also notes Drexel eliminated a woman's position the day she returned from leave and argues this decision can be considered a pattern of routine practice evidence under F.R.E. 406.[60]

To demonstrate Drexel's reasons are pretext, Checa must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably … disbelieve the employer's articulated legitimate reasons."[61] Checa must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Drexel's] proffered legitimate reasons for its actions" to allow a reasonable fact finder to find them "unworthy of credence."[62] In *Lichtenstein*, the court found the plaintiff did show enough contradicting evidence to defeat her former employer's explanation for her discharge. UPMC, Lichtenstein's former employer, claimed Lichtenstein's late arrival to work motivated the decision, not her request for FMLA leave. To defeat these defenses, Lichtenstein demonstrated inconsistencies in these reasons, by showing her supervisor could not remember the date of this late arrival or when he made the decision to terminate the plaintiff, the exclusion of this late arrival from UPMC's explanation to the EEOC, and its exclusion from the staff log her supervisor reviewed before the discharge.[63]   Based on

13

these reasons, the court found a reasonable fact finder could infer this incident did not truly motivate the decision to discharge, but served as merely a pretext for taking FMLA leave.[64]

Checa fails to show Drexel's refusal to allow her to rescind her resignation is a pretext for retaliation, because by her own admission, neither Lally nor Zervoudakes said anything negative to her about her FMLA leave. Checa acknowledged the core problems with the meeting were the lack of greetings and the criticisms of her failing to complete certain tasks before taking leave. Moreover, Lally's alleged contradiction of her own testimony is nothing more than a characterization issue. In her deposition, Lally described what she said during the meeting regsarding "the issues that were incomplete".[65]   Checa's attorney asked her, "That wasn't a criticism?" and Lally responded, "No. That was my job."[66]   Checa observes Lally stated in her statement to the Equal Employment Opportunity Commission "Ms. Checa resigned because she was angry about the criticism made . . . ."[67]   It can hardly be the case this semantical argument evidences the real reason behind Drexel's decision not to rescind Checa's resignation, or hold the September 16 meeting at all, was to retaliate against her for taking FMLA leave.

Additionally, Checa's claim for a retaliatory motive stems from conversations she had with Beverly Johnson who allegedly said Drexel set her up, and Joyce Segal who said "she has seen Lally do this before."[68]   Beverly Johnson denied ever saying this, and the parties did not depose Joyce Segal. Checa has vague feelings and intuitions, which are not substantiated by any actual evidence, whether direct or circumstantial. Also, unlike *Lichtenstein*, Checa has not pointed to any factual inconsistencies from which a reasonable factfinder could disbelieve Drexel's proffered legitimate, non-discriminatory reasons. Checa fails to show the "first day back" meeting served as a pretext for retaliation.

Drexel's refusal to allow Checa to rescind her resignation did not serve as a pretext for retaliation. Dr. Reynolds stated Checa's unprofessional actions and the distasteful manner in which she resigned motivated his decision to not allow her to rescind her resignation.[69] Checa's claim of a retaliatory motive stems from Beverly Johnson's denied statement. Even assuming a question of credibility as to whether she ever said "Drexel set her up", Beverly Johnson's opinion cannot be imputed to Drexel. She is, at worst, parroting rumor. Checa adduces no evidence Beverly Johnson has any foundation for claiming Drexel "set her up" to retaliate for Checa's FMLA leave. Mere rumors cannot overcome Drexel's legitimate business reasons.[70] Unlike *Lichtenstein*, Checa has not pointed to any factual inconsistencies from which a reasonable factfinder could disbelieve Drexel's proffered legitimate, non-discriminatory reasons. Checa offered no evidence to disprove, or lead a factfinder to reasonably disbelieve, Reynolds' reasons for the discharge and cannot show retaliation motivated his decision.

Checa's pretext evidence focused on additional compensation paid to Zervoudakes during her leave would mitigate against pretext; why would Drexel want to pay more compensation to do Checa's job? It is better off having Checa do the job had she not resigned. Zervoudakes may have wanted, or appreciated, more pay but there is no evidence Dr. Reynolds' made his decision based on any Zervoudakes' compensation. Similarly, Checa's reference to Drexel eliminating a woman's position on the same day that woman returned from maternity leave has no connection to its decision not to accept Checa's rescinded resignation.[71] She quit. Drexel did not eliminate her job.

## III.    Conclusion

Checa failed to establish a *prima facie* FMLA retaliation claim because she cannot show an adverse employment action or prove causation between an adverse employment action and

her FMLA leave. Even if we found a *prima facie* retaliation claim, Drexel and Lally prevail because Checa cannot defeat Drexel's several legitimate, non-discriminatory reasons for the alleged adverse actions.  We grant Drexel's and Lally's motion for summary judgment in the accompanying Order.[72]

---

[1] The Court's Policies require that a Statement of Undisputed Material Facts ("SUMF") be filed in support of a Fed.R.Civ.P. 56 motion, as well as an appendix of exhibits or affidavits. Defendants filed their SUMF at ECF Doc. No. 32 ("Defs.' SUMF").  Plaintiff responded to the Defendant's SUMF at ECF Doc. No. 35-1, referred to as "Pl.'s SUMF."   References to exhibits in the appendices shall be referred to by Bates number, for example, "Appendix (A.) 1."

[2] (A. at 48.)

[3] (A. at 223, 13:15-20.)

[4] (A. at 187, 10:7-11:5, 12:24-13: 23.)

[5] (A. at 118, 133: 11-134:13.)

[6] (A. at 52.)

[7] (A. at 133, 191:15-24; A. at 188, 16:1-20.)

[8] (A. at 53-58.)

[9] (Defs.' SUMF, ¶ 66; A. at 11, ¶ 33.)

[10] (Defs.' SUMF, ¶ 70.)

[11] (A. at 66; A. at 192, 31:4-10; A. at 193, 34:20-35:4)

[12] (A. at 95, 40:11-41:22).

[13] (A. at 96 at 44:1-3).

[14] (A. at 96 at 45: 15-22).

[15] (A. at 73.).

[16] (A. at 97, 48: 7-22.)

[17] (A. at 176, 41:14-42:1.)

[18] (A at 94, 36: 21-23.)

[19] Beverly Johnson denied under oath making this statement. (A. at 259, 33: 12-20.) The parties did not depose Joyce Segal. (A. at 100, 61: 4-17.)

[20] Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(a). A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On a motion for summary judgment, the court must consider the "underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 264 (3d Cir. 2006) (citations omitted). If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In other words, the non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citation and internal quotation marks omitted). Summary judgment must be granted against a non-moving party who fails to sufficiently "establish the existence of an essential element of its case on which it bears the burden of proof at trial." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

[21] *Lichtenstein v. Univ. of Pitt. Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012).

[22] *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 256 (3d Cir. 2014).

[23] *Lichtenstein*, 691 F.3d at 302.

[24] *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

[25] *Id.* at 763.

[26] *Id.*

[27] *Budhun*, 765 F.3d at 257 (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)).

[28] *Id.*

[29] *See Caver v. City of Trenton*, 420 F.3d 243, 256 (3d Cir. 2005) (holding the transfer to light duty with less prestige to be an adverse employment action because it significantly altered the employee's duties and status); *Weston v. Pennsylvania*, 251 F.3d 420, 430-31 (3d Cir. 2001) (holding suspension without pay, change of work schedule, or reassignment can constitute adverse employment actions).

[30] *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67-68 (2006).

[31] *Id.* at 68.

[32] *Id.* ("Title VII, we have said, does not set forth a general civility code." (internal quotation omitted)).

[33] *Id.* at 69.

[34] *Id.*

[35] *Budhun*, 765 F.3d at 257 n.6.

[36] *Grosso v. Fed. Express Corp.*, 467 F. Supp. 2d 449, 458-59 (E.D. Pa. 2006); *Chapman v. UPMC Health Sys.*, 516 F. Supp. 2d 506, 423-34 (W.D. Pa. 2007).

[37] (A. at 193, 34:20-23).

[38] (A. at 187-188, 12:24-13:5).

[39] *Burlington*, 548 U.S. at 68.

[40] In our Order-Memorandum dismissing Checa's complaint in part, we found she could not establish a compound hostile work environment and constructive discharge claim. (ECF Doc. No. 29) While it is possible our decision applies with equal force to the constructive discharge claim before us now, we recognize we did not give an in depth examination of the constructive discharge elements. Accordingly, we address the issue in full here.

[41] *Lanza v. Postmaster Gen. of the U.S.*, 570 F. App'x 236, 240 (3d Cir. 2014) (quoting *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001)).

[42] *Id.*

[43] *Lebofsky v. City of Phila.*, 394 F. App'x 935, 939 (3d Cir. 2010) (citing *Clowes v. Allegheny*, 991 F.2d 1159, 1161 (3d Cir. 1993)).

[44] *See Schofield v. Metro. Life Ins. Co.,* 252 F. App'x 500, 503 (3d Cir. 2007) (affirming an employee who voluntarily resigns cannot show he suffered an adverse employment action at the hands of the employer).

[45] *Jones v. McCormick & Schmick's Seafood Restaurants, Inc.*, No. 12-4503, 2014 WL 1669808, at *5 (D.N.J. Apr. 28, 2014); *See also Hibbard v. Penn-Trafford Sch. Dist.*, No. 13-622, 2014 WL 640253, at *10 (W.D.Pa. Feb 19, 2014) (holding a voluntary resignation, and the employer's subsequent failure to accept her rescission of the voluntary resignation, is not an adverse employment action).

[46] *Budhun*, 765 F.3d at 257 (quoting *Robinson*, 120 F.3d at 1300 ).

[47] *Id.* at 258.

[48] *See Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 280 (3d Cir. 2000) ("Temporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not 'unusually suggestive.'")

[49] *Weiler v. R&T Mech., Inc.*, 255 F. App'x 665, 668 (3d Cir. 2007).

[50] *Id.*

[51] *Calero v. Cardone Indus., Inc.,* No. 11-3192, 2012 WL 2547356, at *6 (E.D. Pa. June 29, 2012).

[52] *See EEOC v. L.B. Foster Co.*, 123 F.3d 746, 753 (3d Cir. 1997) (finding a causal connection of retaliation based on temporal proximity, inconsistencies in defendant's testimony, certain conduct towards others, and refusals to provide a reference for the plaintiff), *Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir. 1986) (taking inconsistencies in defendant's explanations into account to find the causation necessary to satisfy a *prima facie* case);

[53] *Weiler*, 255 F. App'x at 669.

[54] *Id.*

[55] *Calero*, 2012 WL 2547356, at *7.

[56] *Burlington v. News Corp.*, 55 F. Supp. 3d 723, 738-39 (E.D. Pa. 2014).

[57] (A. at 178, 52:1-55-2).

[58] *Fuentes*, 32 F.3d at 763.

[59] (Pl. Resp. to Defs. Mot. 9).

[60] While Checa advances a routine practice argument, Checa admitted to taking FMLA leave from Drexel 2012 with apparently no negative response from Drexel. *See* A at 228, 34: 16-37:7); (Pl. Resp. to Defs. Mot. 10)).

[61] *Lichtenstein*, 691 F.3d at 310.

[62] *Id.*

[63] *Id.*

[64] *But see Innella v. Lenape Valley Found.,* No. 14-2862, 2015 WL 9450861, at *12 (E.D. Pa. Dec. 23, 2015) (holding plaintiff did not demonstrate the proffered reason for termination was pretextual because the 'contradicting evidence' was vague, superficial at best, and a factual misrepresentation of the underlying testimony).

[65] (A. at 194, 39: 4-10.)

[66] (A. at 194, 39: 11-16.)

[67] (A. at 84.)

[68] (A. at 100, 61: 4-17.)

[69] (A. at 178, 52:1-55-2.)

[70] Fed. R. Civ. P. 56(c)(1)(A); *see also Willis v. UPMC Children's Hosp.*, 808 F.3d 638, 649 (3d Cir. 2015) (finding "rumored, unspecified, and uncorroborated evidence" does not establish pretext).

[71] *See Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881-82 (3d Cir. 2011) (finding a similarly situated individual must be similar in "all relevant respects"), *cert. denied*, — U.S.—, 132 S. Ct. 1645 (2012).

[72] Lally's FMLA liability could only arise as an imputed "employer". We make no findings as to whether Lally could be considered an employer under the FMLA. As we find Checa did not meet its burdens to show a FMLA retaliatory claim against Drexel, we also grant summary judgment to Lally.